*In re* MARRIAGE OF SANG LEE, Petitioner-Appellee, and KWAN MOH LEE, Respondent-Appellant.

First District (2nd Division)   No. 78-1383

Opinion filed November 27, 1979.

Torme, Horwich & Briskman, of Chicago (Robert I. Briskman, of counsel), for appellant.

Joseph H. and Norman Becker and Selwyn Blum, both of Chicago (Gary E. Dienstag and Haas & Dienstag, Ltd., of counsel), for appellee.

Mr. JUSTICE PERLIN delivered the opinion of the court:
This appeal concerns the disposition of property and maintenance

provisions of the new Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1977, ch. 40, pars. 101 through 802) which became effective October 1, 1977. The issues presented for review are: (1) whether the trial court's disposition of property was an abuse of discretion and against the manifest weight of the evidence; and (2) whether the trial court's maintenance order was an abuse of discretion.

For the reasons hereinafter set forth, we affirm the judgment of the circuit court of Cook County.

Prior to October 1, 1977 Sang Lee (hereinafter referred to as the wife), filed a complaint for divorce against Kwan Moh Lee (hereinafter referred to as the husband) under the old Illinois Divorce Act (Ill. Rev. Stat. 1975, ch. 40, pars. 1 through 21.4, repealed eff. Oct. 1, 1977). On May 25, 1978, judgment was entered dissolving their marriage and dividing the property of the parties in a manner purporting to follow the terms of the new Marriage and Dissolution of Marriage Act. The husband appeals, complaining only of the disposition of property and maintenance portions of the judgment. The parties do not dispute that the trial court applied the proper act in reaching the decision.

The parties, both 42 years of age, were married 17 years and have three children ranging in age from 13 years to 18 years. The marital assets and the trial court's disposition thereof were as follows:

1. *An apartment building.* In 1971 the parties purchased as joint tenants an apartment building for $65,000. The down payment of $10,000 was comprised of the parties' joint savings; the remaining $55,000 was mortgaged. Gross monthly rental income equals $815. Monthly payments for principal and interest on the mortgage, taxes and insurance total $615. In addition, all utilities for the entire building are paid by the owners; and monthly expenditures for maintenance and repairs equal approximately $100. Prior to their separation, the parties resided in one of the apartments. Although no professional appraisal was presented to the trial court, the husband testified that the present value of the apartment building is $60,000. The husband also testified that the building is subject to a mortgage of approximately $40,000.

The trial court preserved the husband's one-half interest in the building but enjoined him from filing an action for partition until the youngest child reaches majority. The wife was awarded the right to reside in one of the apartments without any obligations to pay rent. The wife was awarded the right to collect all rents and was made liable for all expenses incurred, notwithstanding that the expenses may exceed the income of the property. In addition, any payments made by the wife toward the principal balance of the mortgage are credited to both the husband and the wife.

2. *A cleaning plant.* In 1974 the parties purchased, in the husband's

name, a cleaning plant for $67,000. The purchase price includes the plant, equipment and good will and was paid in the following manner: a down payment of $22,000 accumulated from the parties' joint savings; a $30,000 loan from the North Shore National Bank, which is now satisfied in full; a $7,000 loan from the sellers, which is now satisfied in full; and an $8,000 loan from the wife's brother, which is now satisfied in full. A 10-year lease on the property was obtained at the time of purchase. Although no professional appraisal was presented to the trial court, the husband testified that the present value of the cleaning plant is $60,000. The 1976 net income from the cleaning plant was approximately $21,000 and the 1977 net income was approximately $19,000.

The trial court awarded the cleaning plant to the wife, but as an equalization factor ordered the wife to pay to the husband the sum of $15,600, payable at the rate of $50 per week. The trial court also found that the income to be derived by the wife from the operation of the cleaning plant was sufficient to adequately support the minor children of the parties and therefore ordered that the support be provided therefrom.

3. *A discount store.* In September 1975 the parties purchased a discount store for $33,000. Although the record manifests confusion, this property appears to have been purchased in the name of the wife. The purchase price was paid in the following manner: a down payment of $23,000 accumulated from the parties' joint savings (which monies were primarily earned from the cleaning plant); and a $10,000 mortgage which is now satisfied in full. The inventory at the time of purchase was $26,000 and at the time of trial had decreased to $15,000. Although no professional appraisal was presented to the trial court, the husband testified that the present value of the discount store is $30,000. The wife testified that once the mortgage was paid in full (August 1978), the net monthly income from the store would be approximately $640.

The trial court awarded the discount store to the husband.

4. In addition to the above properties, the husband owns 50 shares of Greyhound Computer stock which he acquired on July 29, 1970, and 50 shares of Technitrol stock which he acquired on August 11, ᵀ970. The trial court awarded these shares of stock to the husband. The husband also owns an automobile which the trial court awarded to him. The husband personally guaranteed a loan of $5,000 from North Shore Bank, and the court ordered that he be held liable therefor. The parties also own furniture and furnishings which the trial court awarded to the wife. The trial court ordered that the wife be held liable for any outstanding balances due and owing on said furniture.

## I.

■■ ■ We first consider whether the trial court abused its discretion

in dividing the property as described above. We start with the premise that a circuit court judge's resolution of property division is fettered only by the range of reason and that his judgment will not be disturbed in the absence of an abuse of discretion. It is a well-established rule that a reviewing court is not justified in substituting its discretion for that of the trial court. (*Elliott v. Nordlof* (1967), 83 Ill. App. 2d 279, 284, 227 N.E.2d 547.) In determining whether the trial court abused its discretion, the question is not whether the reviewing court agrees with the trial court but rather did the trial court in the exercise of its discretion act arbitrarily without the employment of conscientious judgment or, in view of all the circumstances, exceed the bounds of reason and ignore recognized principles of law so that substantial injustice resulted. This is another way of saying that discretion is abused only where no reasonable man would take the view adopted by the trial court. It would seem that if reasonable men could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion.

■■ The husband contends that the trial court abused its discretion because it exhibited impatience throughout the proceedings and precluded counsel from eliciting testimony that pertained to the contributions of the parties to the acquisition of the marital assets. We note that although the husband argues that he was prevented from introducing evidence, the record reflects an absence of any proffered evidence or offer of proof. Counsel cannot be heard to complain in this court of the trial court's refusal to admit evidence which counsel never proffered to the trial court. (*Liberty Mutual Insurance Co. v. Williams Machine & Tool Co.* (1974), 21 Ill. App. 3d 510, 517, 316 N.E.2d 255.) It should also be noted from the outset that the contributions of the parties to the acquisition of the marital assets is only one of the 10 factors which section 503(c) of the Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1977, ch. 40, par. 503(c)) commands the trial court to consider.[1]

■ The record confirms that the trial court did not exclude from consideration for property division purposes the contributions of each party to the acquisition of the marital assets. Rather, the trial court concluded, after considering all the evidence, that the acquisition of the marital assets came from the joint contributions of the parties, that is, from both the husband's and the wife's earnings. Although the trial court did not place a dollar value on the contributions of each party to acquisition of the marital estate, such specific finding is not required by the statute nor is it, in the opinion of this court, a prerequisite to the validity of property division orders. The trial court's conclusion was based upon the following evidence adduced at trial:

The wife testified that prior to their marriage in 1961, both parties

---

[1] The remaining nine factors are discussed later in this opinion.

had received their bachelor of science degrees in Korea. The husband's degree was in mechanical engineering, and the wife's degree was in English. At the time of their marriage, the wife was employed as a secretary and the husband as a high school teacher. In September 1962 the husband came to the United States to pursue a master of science degree in engineering at Clemson University. At this time one child had already been born of the marriage, and the wife was six months pregnant with their second child. The wife remained in Korea where she was employed as a typist and translator for the Asiatic Research Center. From the time of the husband's departure for the United States in September 1962 until the wife came to the United States in March 1964, the wife supported herself and the children and also sent money to the husband.

Upon her arrival in the United States, the wife worked in New York, first as a hostess and then as a teletype setter. During this time she supported herself, sent money to Korea for the children, and sent money to her husband in South Carolina. The parties did not reside together except during the summer months of 1964 and 1965 when the husband joined the wife in New York for his summer vacation from Clemson University. In 1966 the wife joined the husband in South Carolina where she worked as a teletype setter, earning $70 per week, until their third child was born. During this time the husband earned approximately $1,000 per month. In November 1966 the wife and the third child returned to Korea. In March 1967 the wife joined the husband in Chicago. At that time he was unemployed and she became employed as a teletype setter earning $130 per week.

In 1968 the husband enrolled at Northwestern University to pursue a doctoral degree in engineering. He graduated therefrom in 1971. During this time he gave the wife $200 per month. The earnings of the wife from 1968 until the acquisition of the cleaning plant in 1974 were as follows: 1968, $8,444.19; 1969, $10,319.39; 1970, $13,620.41; 1971, $13,742.94; 1972, $15,321.03; 1973, $14,985.90; 1974, $1,946. The wife then worked full time at the cleaning plant until the purchase of the discount store in September 1975. Thereafter she worked full time at the discount store.

The husband testified that in September 1962 he came to the United States to pursue a master of science degree in engineering at Clemson University. The wife remained in Korea where she was employed as a secretary. When the husband departed for the United States, he gave the wife $1,500. The husband received his master of science degree in engineering from Clemson University in December 1965. During the years 1968 through 1971 the husband attended Northwestern University and received $300 per month as a research assistant. He gave this money to the wife. During the summer of 1970 the husband earned $8,000 as an engineer. In August 1971 the husband obtained his doctoral degree in

engineering from Northwestern University. From 1971 until 1974 the husband was employed by Arthur McKee Co., his first year earning $7,000 and his last year earning $18,600. From October 1974 until September 1975 the husband was employed as an engineer by McDonald Engineering, earning $19,500. At this time he was also working part time at the cleaning plant and performing janitorial tasks at the apartment building owned by the parties. In September 1975 the husband resigned from his position at McDonald Engineering and worked full time at the discount store for two months. Thereafter he worked full time at the cleaning plant.

The record clearly indicates that the trial court did consider the contributions of the parties to the acquisition of the marital assets. In fact, prior to announcing its decision, the trial court remarked that its decision was reached only "after the appraisal of all the evidence adduced before the court, much of which is conflicting. * * *" Section 503(c)(1) does not require the court to ascertain the contributions of the parties with mathematical exactitude or certitude. Nor does section 503(c)(1) require the property to be divided in exact mathematical proportion to the contributions of the parties. We conclude that sufficient evidence of the contributions of the parties to the acquisition of the marital assets was adduced at trial and was considered by the trial court in distributing the marital property.

The husband contends that the trial court exhibited impatience throughout the entire proceedings. We disagree. We have closely reviewed the entire record and each of the 19 instances which the husband designates as an exhibition of flagrant impatience and do not agree that such a characterization is warranted. For example, the husband cites the following remark as an instance of the court's flagrant impatience:

> "The clock is running for both of you. * * * You can stipulate what it costs, that is a very simple stipulation. You guys make it difficult for yourselves. You make it difficult for both of you."

However, the husband has taken the court's remark out of context. The context for this remark follows:

> "Mr. Blum [the wife's attorney]: Now, when was that purchased?
>
> A [the wife]: That was two years ago, in October.
>
> Q: Will you stipulate to the purchase price to save some time, that it was purchased for thirty thousand dollars?
>
> Mr. Briskman [the husband's attorney]: Thirty-three thousand dollars.
>
> Mr. Blum: Was it thirty-three thousand dollars?
>
> A: That I don't know because he never showed me.

Mr. Blum: Between thirty thousand and thirty-three thousand?

A: He never show me.

Mr. Blum: My records show, from what I have been advised by Mr. Briskman, that the down payment was twenty thousand dollars. Do you have a Closing Statement, and if you have some records, I would like to see them so that we can clarify it for the record. Is that a closing Statement that you have there?

Mr. Briskman: Well, I have all of the documents. I can get it on cross with her.

Mr. BLUM: I am trying to save some time. If you have the exact figures, I would like to see them.

The Court: The clock is running for both of you.

Mr. Briskman: I understand, but he could have received his documents upon discovery or proper notice.

The Court: You can stipulate what it costs, that is a very simple stipulation. You guys make it difficult for yourselfs. You make it difficult for both of you."

We certainly cannot say that the trial court exhibited "flagrant impatience" in this instance.

Another instance of "flagrant impatience" cited by the husband follows:

"Mr. Briskman: When did you have your first conversation, if you recall?

A [the husband]: I can't recall the exact date, but I had several conversations.

The Court: The objection is sustained.

Mr. Briskman: No objection is pending your Honor.

Mr. Blum: I was going to make an objection.

The Court: Counsel, it is a continuing objection, * * *."

Again the husband has taken the court's remarks out of context. The entire colloquy follows:

"Q: And when did you have your first conversation?

A: Even before getting married, we talked about me coming to this country—

Mr. Blum: Objection.

The Court: Sustained.

Mr. Briskman: When did you have your first conversation, if you recall?

A: I can't recall the exact date, but I had several conversations.

The Court: The objection is sustained.

Mr. Briskman: No objection pending your Honor.

Mr. Blum: I was going to make an objection.

The Court: Counsel, it is a continuing objection, the same

objection he made about no dates or relevant statement of his conversation, so you go back and he says he doesn't remember the date, he can't tell me."

Again, we cannot conclude that the trial court exhibited "flagrant impatience."

The husband alleges that the trial court's statement "and I am going to have to make an arbitrary finding" is an admission by the court that it abused its discretion. The husband once again takes the court's remark out of context. The full colloquy follows:

"The Court: Yes, but the real estate doesn't carry itself. Who pays the real estate taxes, is that on deposit with the monthly payment?

Mr. Briskman: Yes.

The Court: Does it cover everything?

The Respondent: No, sir, there is a lot of expenses.

The Court: Like what?

The Respondent: Like gas bill and winter like this winter, I paid the—from November, I paid from Four hundred to Five hundred dollars for only month gas bill and there is a water bill and electric in the halls and I get some stuff.

The Court: Gentlemen, this is going to take a Solomon to work out and I am going to have to make an arbitrary finding."

The husband has "seized" upon only the trial court's choice of words. As we shall illustrate below, the record more than amply demonstrates that the trial court was not arbitrary.

The husband contends that the division of the marital property was against the manifest weight of the evidence. The standards for the division of property in a proceeding for dissolution of marriage are set forth in section 503 of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1977, ch. 40, par. 503), which provides in part:

"(c) In a proceeding for dissolution of marriage or declaration of invalidity of marriage, or in a proceeding for disposition of property following dissolution of marriage by a court which lacked personal jurisdiction over the absent spouse or lacked jurisdiction to dispose of the property, the court shall assign each spouse's non-marital property to that spouse. It also shall divide the marital property without regard to marital misconduct in just proportions considering all relevant factors, including:

(1) the contribution or dissipation of each party in the acquisition, preservation, or depreciation or appreciation in value, of the marital and non-marital property, including the contribution of a spouse as a homemaker or to the family unit;

(2) The value of the property set apart to each spouse;

(3) the duration of the marriage;

(4) the relevant economic circumstances of each spouse when the division of property is to become effective, including the desirability of awarding the family home or the right to live therein for reasonable periods, to the spouse having custody of the children;

(5) any obligations and rights arising from a prior marriage of either party;

(6) any antenuptial agreement of the parties;

(7) the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and needs of each of the parties;

(8) the custodial provisions for any children;

(9) whether the apportionment is in lieu of or in addition to maintenance; and

(10) the reasonable opportunity of each spouse for future acquisition of capital assets and income."

The touchstone of proper apportionment is whether a directed distribution is equitable in nature. The trial court is not required by the statute to divide the property with mathematical equality. The friction resulting from an unsuccessful marriage almost inevitably makes continuing dealings between the parties difficult. It is apparent from the disposition of the property that the trial court was attempting to disentangle the parties' financial affairs and free them from each other's interference by apportioning the property to provide for post-marital support rather than ordering periodic payments.

In *Kujawinski v. Kujawinski* (1978), 71 Ill. 2d 563, 576, 376 N.E.2d 1382 the court opined:

"* * * [B]y giving both spouses an interest in 'marital property' upon dissolution of marriage, the legislature [in enacting Section 503] sought to award economic credit in the distribution of property for indirect or domestic contributions to the accumulation of property and sought to replace the concept of post-marital support through alimony with one of post-marital stability through a just distribution of marital property and assets."

Moreover, in the Commissioners' Note to section 308 of the Uniform Marriage and Divorce Act, from which the Illinois act derives, it is stated:

"The dual intention of this section and Section 307 is to encourage the court to provide for the financial needs of the spouses by property disposition rather than by an award of maintenance. Only if the available property is insufficient for the purpose and if the spouse who seeks maintenance is unable to secure employment

appropriate to his skills and interests or is occupied with child care may an award of maintenance be ordered." Uniform Marriage and Divorce Act §308, Commissioners' Note, at 161 (Unif. Laws Annot. 1979).

■■ The primary objective of the courts in fashioning an equitable division of property is to provide adequate support for the children. The second objective is to dissolve the marriage and place the parties in a position from which they can begin anew. The courts should seek a high degree of finality so that the parties can plan their future with some certainty and are not encouraged to repeatedly march to the courthouse. Property division and spousal support should be considered together in attempting to put the two parties in a position so that they may leave the marriage in a self-sufficient status. Merely because a party is unhappy with the disposition does not mean that the disposition is unfair.

In the case at bar, the husband is not being obligated by the trial court to pay child support or maintenance. The trial court deemed that the income from the cleaning plant would be sufficient to provide support for the minor children and ordered the wife to provide for their support therefrom. The trial court preserved the husband's one-half interest in the apartment building and only barred the husband from filing an action for partition until the youngest child reaches majority. Although the wife and the children are permitted to reside in one of the apartments without an obligation to pay rent, the wife is responsible for all expenses incurred in the operation of the apartment building. The court further equalized the division by requiring the wife (the recipient of the cleaning plant valued at $60,000) to pay to the husband (the recipient of the discount store valued at $30,000) $15,600. After such "equalization payment" the value of the husband's interest is $45,600 and the value of the wife's interest is $44,400. The husband was awarded the 100 shares of stock and the automobile. The wife was awarded the household furnishings. The husband was made responsible for a business debt of $5,000 and the wife was made liable for any outstanding balances due and owing on said furniture.

We have previously discussed the trial court's consideration of the first factor enumerated in section 503(c), the contributions of the parties to the acquisition of the marital assets. We have also discussed the trial court's consideration of the second factor, "the value of the property set apart to each spouse." We note again that although equal division is not mandated, after the "equalization payment" the parties' awards were substantially equal. The trial court considered the third factor, the duration of the marriage. The parties were married 17 years, during which time both parties made significant contributions to the acquisition and preservation of the marital estate. The trial court also considered the

fourth factor, "the relevant economic circumstances of each spouse when the division of property is to become effective, including the desirability of awarding the family home, or the right to live therein for reasonable periods, to the spouse having custody of the children." The wife was awarded custody of the children and permitted to reside, without an obligation to pay rent, in the apartment that had been the marital residence.

The fifth and sixth factors enumerated in section 503(c) are not applicable to the case at bar. The trial court also considered the seventh factor, "the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and needs of each of the parties." Both parties are 42 years of age. The husband holds a doctoral degree in engineering and is presumably employable in his field. The wife holds a bachelor of science degree in English. The record reveals that the parties' only sources of income at the time of trial were the cleaning plant and the discount store. The trial court expressly found that the income from the cleaning plant was adequate to meet the needs of the wife and the children. As indicated above, the trial court considered the eighth factor, "the custodial provisions for any children."

The trial court considered the ninth factor, "whether the apportionment is in lieu of or in addition to maintenance." The trial court remarked "* * * and out of the income from that cleaning [plant], based upon the figures submitted to the Court today and previously, she will pay herself maintenance and child support. The extent of that maintenance and child support will be the earnings, net earnings of the [plant]." The trial court also considered the final factor, "the reasonable opportunity of each spouse for future acquisition of capital assets and income." The record demonstrates that the husband has a far greater earning potential than the wife and therefore has a better opportunity for future acquisition of capital assets.

In addition, we note that the "equalization payment" of $15,600 ordered by the court was not against the manifest weight of the evidence and was not an abuse of the court's discretion.

> "Where property is not susceptible to division in kind, or where such a division would be inequitable, the court may award one spouse the property subject to a duty to pay the other spouse for the interest thus lost. Repayment may be made by offsetting other marital property or by cash payments where the offsetting property is insufficient for the purpose. This latter means of property distribution has often been approved in allocating various kinds of property interests." Auerbach, *Property Considerations Upon Dissolution and Declaration of Invalidity*, Family Law 86-59 (Ill. Inst. Cont. Leg. Ed. (1978).

■■ Based upon the foregoing, we conclude that the trial court's disposition of the marital property was not an abuse of the trial court's discretion and was not against the manifest weight of the evidence.

## II.

The husband contends that the trial court abused its discretion when it barred the husband from seeking maintenance from the wife yet reserved for six years the wife's right to seek maintenance from the husband. This contention is without merit. Section 504 of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1977, ch. 40, par. 504) provides:

"(a) In a proceeding for dissolution of marriage or legal separation or declaration of invalidity of marriage, or a proceeding for maintenance following dissolution of the marriage by a court which lacked personal jurisdiction over the absent spouse, the court may grant a maintenance order for either spouse, only if it finds that the spouse seeking maintenance:

(1) lacks sufficient property, including marital property apportioned to him, to provide for his reasonable needs, and

(2) is unable to support himself through appropriate employment or is the custodian of a child whose condition or circumstances make it appropriate that the custodian not be required to seek employment outside the home, or

(3) is otherwise without sufficient income.

(b) The maintenance order shall be in such amounts and for such periods of time as the court deems just, without regard to marital misconduct, after consideration of all relevant factors, including:

(1) the financial resources of the party seeking maintenance, including marital property apportioned to him, and his ability to meet his needs independently, including the extent to which a provision for support of a child living with the party includes a sum for that party as custodian;

(2) the time necessary to acquire sufficient education or training to enable the party seeking maintenance to find appropriate employment;

(3) the standard of living established during the marriage;

(4) the duration of the marriage;

(5) the age and the physical and emotional condition of both parties; and

(6) the ability of the spouse from whom maintenance is sought to meet his needs while meeting those of the spouse seeking maintenance.

(c) The court may grant and enforce the payment of such money

for equitable maintenance during the pendency of an appeal which is against the party receiving such equitable maintenance, as the court shall deem reasonable and proper.

(d) No maintenance shall accrue during the period in which a party is imprisoned for failure to comply with the court's order for the payment of such maintenance."

We first note that the husband never requested maintenance in his counterclaim for dissolution of marriage. In addition, the evidence indicates that the husband was more than able to support himself through appropriate employment, did not lack sufficient property to provide for his reasonable needs, and was not otherwise without sufficient income. It seems clear, therefore, that the trial court did not abuse its discretion when it barred the husband from seeking maintenance from the wife.

Nor did the trial court abuse its discretion when it reserved for six years the wife's right to seek maintenance from the husband. The trial court found that the present income from the cleaning plant was adequate to provide support for both the wife and the children. However, evidence was presented by the husband that the cleaning plant's income had substantially decreased in 1976 and 1977. In six years the lease on the cleaning plant property will have expired and the youngest child will have obtained majority. Moreover, the wife is responsible for all expenses incurred in the operation and maintenance of the apartment building, even if those expenses exceed the income from the building. Under these circumstances it would seem that the trial court exercised reasonable discretion when it manifested its concern for the lesser potential of the wife's earning ability by preserving her right to petition for maintenance.

Based upon the foregoing, we affirm the judgment of the circuit court of Cook County.

Affirmed.

DOWNING and HARTMAN, JJ., concur.